COURT OF APPEALS OF VIRGINIA


Present:  Chief Judge Fitzpatrick, Judge Willis and
          Senior Judge Overton
Argued at Alexandria, Virginia


RANDALL U. MOTTRAM
                                           OPINION BY
v.    Record No. 1472-00-4       JUDGE JERE M. H. WILLIS, JR.
                                         MARCH 6, 2001
FAIRFAX COUNTY FIRE AND RESCUE AND
 FAIRFAX COUNTY BOARD OF SUPERVISORS


           FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

           Diane C.H. McNamara for appellant.

           Ann Gouldin Killalea, Assistant County
           Attorney (David P. Bobzien, County Attorney;
           Robert Lyndon Howell, Deputy County Attorney,
           on brief), for appellees.


     Randall U. Mottram appeals the decision of the Workers'

Compensation Commission denying him benefits for post-traumatic

stress disorder (PTSD).  The commission held that Mottram's PTSD

was not compensable because it was a condition resulting from

cumulative or repetitive trauma, as opposed to an occupational

disease.  For the following reasons, we reverse and remand.

                    I.   BACKGROUND

     Mottram worked for the Fairfax County Fire & Rescue

Department for approximately nineteen years.  He was a paramedic

during the first ten years and an EMS supervisor the remaining

time.  His duties included responding to emergency calls and

rendering aid at the scenes of accidents and other emergencies.

On January 27, 1997, Mottram filed a workers' compensation claim alleging that on March 10, 1996, he suffered an injury by accident. The commission denied Mottram's injury by accident claim, ruling that his condition, which was purely psychological, was not causally related to a physical injury or an obvious sudden shock or fright arising in the course of his employment. Therefore, the commission held that Mottram's condition was not compensable as an injury by accident. That decision was not appealed and became final.

On February 12, 1998, after his injury by accident claim was denied, Mottram filed a new claim seeking benefits for an occupational disease. The transcript of the April 23, 1997 hearing on the injury by accident claim was made a part of the record in the occupational disease case.

At the April 23, 1997 hearing, Mottram testified that on March 10, 1996, he responded to a major fire. After dealing with multiple burn injuries and a fatality, he was assigned to evaluate victims who had escaped the fire. One of these victims, a five-year-old child, asked about her stepmother. Mottram was "taken back" because he had just pronounced the woman dead. The question shocked him. He felt as though he had just been "punched in the stomach." He testified that although some of his previous experiences had been troublesome, he had never before felt like that and nothing had so immobilized him.

At the April 23, 1997 hearing, Mottram denied seeking medical treatment for any disturbing event before the March 10, 1996 incident.  After the March 10 incident, he sought treatment.  He denied feeling suicidal before that incident.  He acknowledged that some of the flashbacks that he experienced after the March 10, 1996 fire reminded him of a fire fifteen to twenty years before, which had involved six fatalities.

At the April 23, 1997 hearing, Mottram admitted thinking before March 10, 1996 that he might be predisposed to PTSD.  However, he testified that after that incident, he was unhappy, had lost interest in life, and had memory problems.  At the April 23, 1997 hearing, Mottram minimized the psychological impact of shocking events that he had experienced prior to March 10, 1996.  He testified to no previous traumatic event, other than the fire that had occurred fifteen to twenty years before.

On July 14, 1998, at the hearing on his occupational disease claim, Mottram testified that over the years he had responded as a paramedic to approximately ten calls per day but that not all were severe.  He testified to responding to multi-victim motor vehicle accidents, burns, multi-family house fires with fatalities, and other events resulting in death and serious injury.  He described some of these calls as being especially horrific because they involved shootings, stabbings,

amputations and decapitations.  He had not mentioned these in the injury by accident case.

Mottram was evaluated by Dr. Mary W. Lindahl, a clinical psychologist, on March 4, 1996, six days before the incident that underlay his injury by accident claim.  At that time, he was concerned that he had PTSD.  He described to Dr. Lindahl symptoms of intrusive thoughts, overwhelming anxiety, excessive sleeping, and thoughts of former emergencies he had attended.  He told Dr. Lindahl that he was considering taking a leave of absence due to stress.

On April 13, 1996, Dr. Lindahl reported:

> Mottram is at present in a severe vegetative depression characterized by severe anxiety, an overwhelming need for sleep, nightmares, hopelessness about the future, mental confusion, inability to concentrate, loss of appetite, social withdrawal, and suicidal ideation. . . .

Dr. Lindahl stated that Mottram's symptoms began after responding to a fatal fire.  However, as evidenced by Dr. Lindahl's report of the March 4, 1996 interview, he had those symptoms prior to the March 10 fire.[1]  She opined that his PTSD and depressive symptoms were directly related to his work in the fire department.

---

[1] In a May 4, 1996 report, Dr. Lindahl clarified that Mottram had some symptoms of PTSD when she first saw him on March 4, 1996.  However, the symptoms worsened into serious PTSD and major depression after the March 10, 1996 incident.

- 4 -

Dr. Lindahl referred Mottram to Dr. Randolph A. Frank, Jr., a psychiatrist, who concurred in her diagnosis of PTSD. Dr. Frank determined that Mottram had been depressed at least since December 1995.

On June 4, 1996, at the request of the employer, Dr. Brian Schulman, a psychiatrist, conducted an independent psychiatric evaluation of Mottram. In his July 9, 1996 report, Dr. Schulman concluded that Mottram suffered from major depression, with the onset occurring during the fall of 1995. He opined that, "[t]o a reasonable degree of medical certainty, this depression was not precipitated or accelerated by any condition emanating from Mr. Mottram's employment." Dr. Schulman further opined that nothing outside the normal range of firefighting experiences occurred on or about March 10, 1996 for which Mottram would not have been adequately trained and prepared.

On August 14, 1996, Dr. Frank expressed his strong disagreement with Dr. Schulman's conclusions. He stated that as Mottram's treating physician, he felt that he knew him extremely well. Dr. Frank also stated that he was well versed in the diagnosis and treatment of PTSD, because he served as the consultant for the Virginia State Police and had treated many cases of PTSD in that capacity. He opined that:

> Mottram suffers from PTSD which he
> incurred in the line of duty as
> characterized by marked and intrusive
> distressing recollections of events noted in

> a number of calls that he was involved in,
> recurrent distressing dreams, significant
> symptoms of increased arousal and anxiety,
> sleep disturbance, severe difficulty
> concentrating, and extreme hypervigilance.
> He also displays some emotional detachment
> and restricted range of affect that are also
> consistent with the disorder.  I do not feel
> that this was related to a pre-existing
> depression, but rather his symptoms
> developed over the course of the last year
> as he became exposed to a number of severely
> distressing stimuli in his work as a
> firefighter.

Dr. Lindahl also disagreed with Dr. Schulman.  She stated that she had extensive training and experience in the diagnosis and treatment of PTSD.  She stated that Mottram had answered numerous calls that met the trauma elements in the PTSD diagnostic criteria and that he was experiencing symptoms of PTSD prior to March 10, 1996.  Dr. Lindahl stated that the March 10 incident was traumatic to Mottram because it reminded him of a similar fatal fire five years before.

In a January 1, 1998 report, Dr. Lindahl stated that PTSD is a known risk of employment for emergency service workers and that there was no evidence that Mottram was exposed to similar conditions outside of his employment.  In a March 9, 1998 report, she stated that Mottram's PTSD was related to his work and that his development of depression was secondary to the PTSD.  On May 16, 1998, in response to a questionnaire from Mottram's counsel, she explained the etiology of his PTSD as follows:

Mottram's PTSD was produced by exposure to critical incidents. There is no physical trauma involved. Rather, exposure to the incident(s) result in neurochemical alterations in multiple neurotransmitter systems . . . . These changes appear to be a result of the organism's adaptive survival responses. These responses, initially beneficial to the individual, also result in long-term negative symptoms of PTSD.

The deputy commissioner denied Mottram's occupational disease claim, finding that his PTSD resulted from cumulative or repetitive trauma. On review, the full commission affirmed. In so ruling, the full commission concluded as follows:

To treat PTSD, in the context of this case, as a disease rather than a condition resulting from cumulative trauma would be to expand the definition of "disease" too broadly . . . . In fact, both the criteria for PTSD and its definition are more consistent with an injury resulting from cumulative trauma in this case. The condition follows a traumatic and shocking event, or events as is the case here. This is more consistent with cumulative trauma than the development of a disease.

## II.  PTSD UNDER THE ACT

Mottram contends the commission erred when it concluded that his PTSD was a "cumulative trauma" condition. He argues that PTSD is a disease and that he should be compensated for his PTSD as an occupational disease.

The compensability of work-related mental disabilities has been a controversial topic in workers' compensation law. As has often been stated, the Workers' Compensation Act defines two

compensable categories: injury by accident and occupational disease.  See Code § 65.2-101 (defining "injury"); Code 65.2-400 (defining "occupational disease"); see also Holly Farms v. Yancey, 228 Va. 337, 340, 321 S.E.2d 298, 300 (1984) ("A definition of either 'injury' or 'disease' that is so broad as to encompass any bodily ailment of whatever origin is too broad because it would make unnecessary and meaningless the two categories specifically set forth in the Act.").  The Supreme Court has recognized that the term "disease" does not equate with the term "injury."  Stenrich Group v. Jemmott, 251 Va. 186, 193 n.1, 467 S.E.2d 795, 799 n.1 (1996).  The term "injury" does not include a disease in any form, as used in Code § 65.2-101, but is "language of limitation."  Id.  "[W]hether a claimant suffers from a disease within the contemplation of the Act is a mixed question of law and fact, and whether a proper definition has been used to test the authenticity of a doctor's opinion is strictly a legal one."  Id. at 198, 467 S.E.2d at 801.

"A disease is a condition which may arise from any number of causes, including trauma, that impairs the function of the body or any part thereof. . . . The distinction between injury and disease lies in the 'obvious sudden mechanical or structural' aspect of injury."  Ogden Aviation Services v. Saghy, 32 Va. App. 89, 97, 526 S.E.2d 756, 760 (2000) (citation omitted).  See also 1B Arthur Larson, The Law of Workers'

Compensation § 41.31, at 7-491 to 7-492 (1991) (noting that the traditional distinction between "occupational diseases" and "accidental injuries" was "both the fact that [diseases] could not honestly be said to be unexpected, since they were recognized as inherent hazard[s] of continued exposure to conditions of the particular employment, and the fact that [diseases] were gradual rather than sudden in onset").

Considering these distinctions, we conclude that PTSD may be compensable as an "injury by accident" or as an "occupational disease," depending on how it develops. This conclusion is buttressed by both the commission's decisions and our decisions, which have treated PTSD both as an injury and as a disease.

## A. PTSD AS AN INJURY

We have recognized that, under appropriate circumstances, PTSD may be compensable as an injury by accident. See Hercules v. Gunther, 13 Va. App. 357, 412 S.E.2d 185 (1991). In Hercules, a power plant truck driver was delivering rocket propellant to a building. As he walked toward the building, it exploded. Although he sustained only minor physical injuries, two of his friends, with whom he had just been talking, were killed. Thereafter, he was diagnosed with PTSD. Affirming the commission's award, we held that the driver's PTSD was compensable as an injury by accident because it resulted from "an obvious sudden shock or fright arising in the course of

- 9 -

employment."  Id. at 362-63, 412 S.E.2d at 188.  See also

Burlington Mills Corp. v. Hagood, 177 Va. 204, 13 S.E.2d 291

(1941) (holding that a nervous condition resulting from a sudden

shock or fright without physical impact may be compensable).

## B.  PTSD AS A DISEASE

We have also had occasion to address PTSD as a disease.

See Teasley v. Mongomery Ward & Co., 14 Va. App. 45, 415 S.E.2d

596 (1992); Marcus v. Arlington County Bd. of Supervisors, 15

Va. App. 544, 425 S.E.2d 525 (1993).

In Teasley, the employee, following an ongoing series of

disagreements, had a confrontation with his supervisor over his

work assignments.  He broke down emotionally and was diagnosed

with PTSD.  He sought benefits, contending that his PTSD was an

occupational disease.  The commission held that PTSD was "an

ordinary disease of life to which the general public is exposed

outside of employment."  It denied the employee's claim because

he failed to prove entitlement to compensation under Code

§ 65.1-46.1 (now Code § 65.2-401).  Holding that the evidence

supported those findings, we affirmed that decision.  Teasley,

14 Va. App. at 49-50, 415 S.E.2d at 598-99.

In Marcus, an emergency communications technician

supervisor developed "traumatic stress reaction with physical

manifestations."[2]  Her duties as an emergency communications

technician supervisor included the dispatch of police, fire and

ambulance units and counseling subordinate personnel to help

them deal with the stress of their duties.  Finding that

traumatic stress reaction "is the same kind of reaction that

occurs in a setting outside of the employment," the commission

held that Marcus' condition was an ordinary disease of life.

Affirming, we said:

> Physical reactions to stress, such as those
> experienced by Marcus, are suffered by much
> of the population and are caused by a
> variety of factors.  Indeed, the commission
> found that the symptoms Marcus experienced
> were caused not only by her job, but also by
> events outside of her employment -- events
> to which the general public is exposed
> outside of the employment -- . . . .  We
> find that this conclusion is supported by
> credible evidence in the record and,
> accordingly, we will not disturb the
> commission's finding on appeal.  See Knott
> v. Blue Bell, Inc., 7 Va. App. 335, 338, 373
> S.E.2d 481, 483 (1988) ("the question
> whether a condition or disease is an
> ordinary disease of life is essentially a
> medical issue to be decided by the trier of
> fact based on the evidence presented").

Marcus, 15 Va. App. at 550, 425 S.E.2d at 529.

---

[2] Although Marcus experienced some emotional response to her stress, her condition was primarily "mental-physical"; that is, she suffered physical symptoms resulting from mental stress. However, her condition, like Mottram's, derived from mental stress.  Therefore, we find her case instructive.

- 11 -

III.  MOTTRAM'S PTSD

The threshold question in this case is whether Mottram's condition is an injury or a disease.  If the former, his right to compensation is barred by the commission's decision rejecting his injury by accident claim.  If his condition is a disease, it remains to be determined whether it is an occupational disease defined by Code § 65.2-400, or an ordinary disease of life.  If the latter, we must determine whether it is compensable under Code § 65.2-401.

In A New Leaf, Inc. v. Webb, 257 Va. 190, 511 S.E.2d 102 (1999), the Supreme Court addressed the distinction between injury and disease.  Webb, a flower shop employee, suffered allergic contact dermatitis resulting from physical contact with chemicals in flowers.  Her condition was described as a "reaction of the body's immune system to the substance to which that person is sensitive."  Id. at 197, 511 S.E.2d at 105.  Distinguishing between the body's response to irritating stimuli and physical impairment based on cumulative trauma resulting from repetitive motion, the Court held that Webb's condition was a disease.  Id. at 197-98, 511 S.E.2d at 105.

Webb's condition was physical.  Mottram's condition is psychological.  However, the two cases are analogous.  Just as Webb's condition resulted from a bodily reaction to irritating stimuli, Mottram's condition resulted from "neurochemical

- 12 -

alterations in multiple neurotransmitter systems . . . [being] a result of [his body's] adaptive survival responses."  Thus, we hold that Mottram's condition is a disease.

Although, when based upon a single physical injury or obvious sudden shock or fright, PTSD may be considered an injury by accident, when it is suffered as a result of ongoing stress, it qualifies as a disease.  Therefore, having identified Mottram's condition as resulting from multiple stressful events, the commission erred in designating it an injury and in refusing to consider it as a disease.

Because PTSD is a condition that may develop from the general stresses of life and is not necessarily tied to occupational stress, it is an ordinary disease of life as defined by Code § 65.2-401.[3]  Therefore, the commission must

---

[3] Code § 65.2-401 reads:

> "Ordinary disease of life" coverage. -- An ordinary disease of life to which the general public is exposed outside of the employment may be treated as an occupational disease for purposes of this title if each of the following elements is established by clear and convincing evidence, (not a mere probability):

> 1.  That the disease exists and arose out of and in the course of employment as provided in § 65.2-400 with respect to occupational diseases and did not result from causes outside of the employment, and

- 13 -

determine whether, under the circumstances of his case, that condition is nonetheless compensable under the provisions of Code § 65.2-401.

                                    Reversed and remanded.

---

2.  That one of the following exists:

a.  It follows as an incident of occupational disease as defined in this title; or

b.  It is an infectious or contagious disease contracted in the course of one's employment in a hospital or sanitarium or laboratory or nursing home as defined in § 32.1-123, or while otherwise engaged in the direct delivery of health care, or in the course of employment as emergency rescue personnel and those volunteer emergency rescue personnel referred to in § 65.2-101; or

c.  It is characteristic of the employment and was caused by conditions peculiar to such employment.

- 14 -