Present:  All the Justices

FAIRFAX COUNTY FIRE AND RESCUE
DEPARTMENT, ET AL.

v.  Record No. 010791  OPINION BY JUSTICE CYNTHIA D. KINSER
                                    March 1, 2002
RANDALL U. MOTTRAM

FROM THE COURT OF APPEALS OF VIRGINIA

In this workers' compensation claim, the issue is
whether posttraumatic stress disorder (PTSD) is a disease
and, if so, whether it is an ordinary disease of life or an
occupational disease as defined in Code § 65.2-400.
Because we conclude that the evidence establishes that the
PTSD suffered by the employee in this case is an
occupational disease, we will affirm in part and reverse in
part the judgment of the Court of Appeals holding that PTSD
is an ordinary disease of life.

FACTS AND MATERIAL PROCEEDINGS

Randall U. Mottram had been employed by the Fairfax
County Fire and Rescue Department (the Department) and the
Fairfax County Board of Supervisors (collectively with the
Department, the Employer), for 19 years when he was
diagnosed with PTSD in 1996.  During the first ten years of
his employment, he worked as a paramedic and then became a
paramedic supervisor with the rank of captain.  In both of
those positions, Mottram responded to approximately ten

emergency calls per day.  Not all of the calls to which he responded as a paramedic involved severely injured people. However, as a supervisor, he responded to the "big serious calls with lots of people needing medical care."  Those emergency calls included incidents such as airplane crashes, amputations and decapitations, automobile accidents with multiple victims, shootings, stabbings, and house fires with fatalities of entire families.

Beginning in the early 1990's, Mottram was assigned to various administrative posts that did not require him to respond to emergencies.  However, every two months, Mottram worked a 24-hour shift involving emergency response in order to maintain his certification as a paramedic.

Mottram was working such a shift on March 10, 1996, when he responded to a fire at a residence that resulted in multiple burn injuries to several people and one fatality. The fire was especially disturbing to Mottram because it reminded him of a horrible house fire to which he had responded fifteen to twenty years earlier in which six members of a family, including children and grandparents, had perished.  While Mottram was treating a five-year-old girl at the March 10 fire, the child inquired about her stepmother.  Mottram had just pronounced the stepmother dead at the scene of the fire, and he was aware that the

2

child's father was critically injured.  In describing his reaction to the child's question, Mottram stated that he "became removed from the scene.  I was outside of myself." He said that he felt a "shroud of darkness" come over him and that he had difficulty breathing.

Mottram first consulted Dr. Mary W. Lindahl, a licensed clinical psychologist, on March 4, 1996, six days prior to that March 10 emergency response call, because he was concerned that he might be predisposed to suffering a disabling injury.  He reported experiencing intrusive thoughts, overwhelming anxiety, and excessive sleeping. Mottram saw Dr. Lindahl again on March 6 and 7.  During those visits, he stated that his symptoms persisted and that he was considering taking leave from work because of stress.

During another appointment three days after the incident on March 10, Dr. Lindahl described Mottram as "noticeably more distressed, and . . . becoming seriously depressed."  Dr. Lindahl concluded that it "is difficult to separate out the impact of the [March 10] call on Mr. Mottram's condition. . . . Clearly, he had some symptoms of PTSD when he first came on [March 4]; however, his symptoms worsened into a serious PTSD and major depression after the [March 10] incident."  By December 1996, Mottram was

3

suicidal and had to be hospitalized for treatment, which included electroconvulsive therapy.  In a series of medical status reports from March 1996 through June 1996, Dr. Lindahl consistently described the March 10, 1996 episode as the "critical incident."  However, she also separately noted that Mottram "has chronic PTSD, so other work-related incidents also contributed."

Dr. Lindahl further stated that there is no evidence that Mottram was exposed to critical incidents outside his employment.  Likewise, at a hearing on his workers' compensation claim, Mottram testified that he had not been exposed to medical emergencies or fires, nor had he witnessed death or violent trauma, outside the circumstances of his employment with the Department.

In 1998, Dr. Lindahl expressed the following opinion regarding Mottram's condition:

> It is my opinion that Capt. Mottram is suffering from an occupational disease which arises out of the course of his employment in the Fairfax County Fire Department.  It is well-documented in the psychological literature that emergency services workers are at increased risk for Post-Traumatic Stress Disorder, and there is some evidence indicating that the longer the exposure, the more severe the reaction.  Mr. Mottram had a long career in the Fire Department with exposure to many critical incidents. As a result, he has developed Post-Traumatic Stress Disorder that is chronic and cumulative.

4

The psychological literature to which Dr. Lindahl was referring included an article discussing the neurobiology of PTSD. Relying on that article, Dr. Lindahl stated that Mottram's exposure to critical incidents resulted in "neurochemical alterations in multiple neurotransmitter systems." See Steven M. Southwick et al., Neurobiology of Post-Traumatic Stress Disorder in PSYCHOTRAUMATOLOGY, KEY PAPERS AND CORE CONCEPTS IN POST TRAUMATIC STRESS 49, 53 (George S. Everly, Jr. & Jeffrey M. Lating eds., 1995).

Dr. Lindahl referred Mottram to Dr. Randolph A. Frank, Jr., a psychiatrist who concurred in the diagnosis of PTSD. Dr. Frank opined that Mottram's PTSD was "incurred in the line of duty as characterized by marked and intrusive distressing recollections of events noted in a number of calls that he was involved in, recurrent distressing dreams, significant symptoms of increased arousal and anxiety, sleep disturbance, severe difficulty concentrating, and extreme hypervigilance."[1]

---

[1] On brief, the Employer discusses a psychiatric evaluation of Mottram conducted by Dr. Brian Schulman at the request of the Department. Dr. Schulman diagnosed Mottram as suffering from major depression that "was not precipitated or accelerated by any condition emanating from Mr. Mottram's employment." Despite noting symptoms of a depressed affect, moderate degree of anxiety, and insomnia, Dr. Schulman found no medical basis upon which to ascribe those symptoms to PTSD.

In January 1997, Mottram filed a workers' compensation claim alleging that on March 10, 1996, he suffered an injury by accident arising out of and in the course of his employment, which resulted in temporary total disability due to PTSD.  In the alternative, Mottram claimed that he was suffering from an occupational disease.  At a hearing before the Deputy Commissioner, Mottram elected to proceed only on the theory of injury by accident and withdrew the occupational disease claim.

The Workers' Compensation Commission (the Commission) denied Mottram's claim, deciding that Mottram had not proven a compensable injury by accident and that his condition was not causally related to the incident on March 10, 1996.  Mottram did not appeal that decision.

Mottram subsequently filed a second application, claiming that his PTSD was an occupational disease arising out of and in the course of his employment.  The Commission again denied the claim, finding that Mottram's PTSD was not compensable because it was a condition resulting from cumulative or repetitive trauma, rather than a disease.  In distinguishing this Court's decision in A New Leaf, Inc. v.

---

However, the validity of the diagnosis of Mottram's PTSD is not at issue in this appeal because the Employer did not assign error to the finding that Mottram suffers from PTSD.  See Rule 5:17(c).

6

<u>Webb</u>, 257 Va. 190, 511 S.E.2d 102 (1999), the Commission concluded that Mottram's condition was "attributable to exposure to one or more significant and distinct traumatic events" rather than to a general exposure to such incidents.[2]

Mottram appealed the Commission's denial of his occupational disease claim to the Court of Appeals. That court reversed, holding that Mottram's condition is a disease. <u>Mottram v. Fairfax County Fire & Rescue</u>, 35 Va. App. 85, 96, 542 S.E.2d 811, 816 (2001). In reaching that conclusion, the court recognized that PTSD may be compensable as an injury by accident under certain circumstances, but that, in other situations, it may be appropriately classified as a disease. <u>Id.</u> at 93, 542 S.E.2d at 814. The Court of Appeals found that Mottram's condition was analogous to the employee's allergic contact dermatitis in <u>A New Leaf</u> because, "[j]ust as [that employee's] condition resulted from a bodily reaction to irritating stimuli, Mottram's condition resulted from 'neurochemical alterations in multiple neurotransmitter

---

[2] A Deputy Commissioner had found that the evidence was "insufficient to establish that [Mottram's] claim is compensable as an ordinary disease of life." Since the Commission concluded that Mottram's PTSD is not a disease,

7

systems.' " Id. at 95, 542 S.E.2d at 815.  However, the
court concluded that, because "PTSD is a condition that may
develop from the general stresses of life and is not
necessarily tied to occupational stress," it is an ordinary
disease of life within the meaning of Code § 65.2-401.  Id.
at 96, 542 S.E.2d at 816.  Thus, the court remanded
Mottram's claim to the Commission for a determination as to
whether Mottram's PTSD qualifies as a compensable ordinary
disease of life.  Id.

The Employer appeals from that decision, asserting
that the Court of Appeals erred in finding that PTSD may be
a compensable ordinary disease of life.  Mottram assigned
cross-error.  He contends that the Court of Appeals erred
by concluding that PTSD is not an occupational disease.

ANALYSIS

The issue whether an employee "has suffered an
impairment that constitutes a compensable disease is a
mixed question of law and fact."  Stenrich Group v.
Jemmott, 251 Va. 186, 192, 467 S.E.2d 795, 798 (1996),
cited in A New Leaf, 257 Va. at 196, 511 S.E.2d at 104.
Hence, the Commission's finding with regard to that mixed
question is not binding on appeal.  Id.  Instead, it is

---

it did not address whether it is an ordinary disease of
life or an occupational disease.

properly subject to review by this Court.  Id.; Peanut City Iron & Metal Co. v. Jenkins, 207 Va. 399, 403, 150 S.E.2d 120, 123 (1966).

As we have previously noted, the Employer does not dispute that Mottram suffers from PTSD.[3]  Thus, as in Jemmott and A New Leaf, the factual part of the question is not at issue in this case.  The legal portion of the mixed question, which the Employer does contest, is whether PTSD is a compensable disease within the purview of the Virginia Workers' Compensation Act, specifically either Code § 65.2-401 (establishing criteria for compensable ordinary disease of life), or Code § 65.2-400 (defining occupational disease).  However, before deciding whether PTSD is compensable under either of these statutory provisions, we must first determine whether PTSD qualifies as a disease. Merillat Indus. v. Parks, 246 Va. 429, 432, 436 S.E.2d 600, 601 (1993).

---

[3] However, relying on the definition of PTSD in the American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994), the Employer attempts to challenge the diagnosis of PTSD by arguing that PTSD can only result from exposure to a single traumatic stressor rather than exposure to separate and distinct traumatic events.  Since the factual finding that Mottram suffers from PTSD is not the subject of an assignment of error, see Rule 5:17(c), the question whether PTSD can be caused by exposure to multiple traumatic events, as opposed to a single such event, is not before us.

With regard to that issue, the Employer argues that, since Mottram's PTSD resulted from exposure to multiple shocking and frightening events, it is a repetitive trauma injury rather than a disease and is, therefore, not compensable under this Court's decisions in such cases as Merillat and Jemmott. The Employer points out that, when the General Assembly amended Code § 65.2-400 to designate hearing loss and carpal tunnel syndrome as ordinary diseases of life, it did not include such disorders as PTSD. Finally, the Employer argues that our decision in A New Leaf is distinguishable because the employee there had constant daily exposure to the allergens whereas Mottram's exposure was to separate and distinct traumatic events. The Employer also notes that, for several years prior to the incident on March 10, 1996, Mottram responded to emergency calls only about six days a year.

Contrary to the Employer's argument, we conclude that our rationale in A New Leaf is controlling. There, the evidence established that the employee's contact dermatitis was caused by her physical contact with chemicals contained in certain flowers. 257 Va. at 197, 511 S.E.2d at 105. The record also included an article introduced into evidence that described contact dermatitis as a " 'reaction of the body's immune system to the substance to which that

10

person is sensitive.' " Id. (quoting Cindy Hoogasian, Dermatitis Concerns Continue, FLORIST, March 1990, at 77). Thus, we held that the employee's exposure over time to a causative agent in the flowers "triggered a dermatological reaction, which is distinct from the wear and tear resulting from a repetitive motion." Id. at 198, 511 S.E.2d at 105.

In the present case, credible evidence establishes that Mottram's repeated exposure to traumatic stressors caused reactions in his neurobiological systems, much like the reaction of the employee's immune system in A New Leaf. Literature referred to by Dr. Lindahl and admitted into evidence explains that, "[u]nder conditions of acute and severe psychological trauma, the organism mobilizes multiple neurobiological systems for the purpose of survival." Southwick at 63. However, these neurobiological responses, although initially beneficial, "may have long-term negative consequences that are related to many of the chronic symptoms of PTSD." Id. at 64. The article also explains that individuals with "chronic PTSD frequently exhibit increased anger, hostility, impulsivity, and dysphoria[,]" and that such symptoms "may be related to

abnormalities in either norepinephrine, 5-HT, or both."[4]

Id. Thus, we conclude, as did the Court of Appeals, that
Mottram's condition is a disease.

Since Mottram's PTSD is a disease, the next inquiry is
whether it is a compensable condition. For it to be
compensable, Mottram must show either that PTSD is an
occupational disease under the provisions of Code § 65.2-
400 or that it is an ordinary disease of life that may be

---

[4] The Columbia Encyclopedia defines norepinephrine as:

> a neurotransmitter . . . that mediates chemical
> communication in the sympathetic nervous system,
> a branch of the autonomic nervous system. Like
> other neurotransmitters, it is released at
> synaptic nerve endings to transmit the signal
> from a nerve cell to other cells. . . . The
> sympathetic nervous system functions in response
> to short-term stress; hence norepinephrine . . .
> increase[s] the heart rate as well as blood
> pressure. Other actions of norepinephrine
> include increased glycogenolysis (the conversion
> of glycogen to glucose) in the liver, increased
> lipolysis (the conversion of fats to fatty acids
> . . .) in adipose (fat) tissue, and relaxation of
> bronchial smooth muscle to open up the air
> passages to the lungs. All of these actions
> represent a mobilization of the body's resources
> in order to meet the stressful challenge – such a
> response is often termed the "flight or fight"
> syndrome.

The Columbia Encyclopedia (6th ed. 2001), available at
http://www.bartleby.com/65/no/norepine.html.

5-HT (an acronym for 5-hydroxytryptamine, more
commonly known as serotonin) is also a neurotransmitter and
is a "potent vasoconstrictor." Taber's Cyclopedic Medical
Dictionary (18th ed. 1997).

12

treated as an occupational disease pursuant to Code § 65.2-401. The term "occupational disease" is defined as "a disease arising out of and in the course of employment, but not an ordinary disease of life to which the general public is exposed outside of the employment." Code § 65.2-400(A). The following six factors are necessary in order to establish that a disease arose out of the employment:

> 1. A direct causal connection between the conditions under which work is performed and the occupational disease;
>
> 2. It can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment;
>
> 3. It can be fairly traced to the employment as the proximate cause;
>
> 4. It is neither a disease to which an employee may have had substantial exposure outside of the employment, nor any condition of the neck, back or spinal column;
>
> 5. It is incidental to the character of the business and not independent of the relation of employer and employee; and
>
> 6. It had its origin in a risk connected with the employment and flowed from that source as a natural consequence, though it need not have been foreseen or expected before its contraction.

Code § 65.2-400(B). An ordinary disease of life may be treated as an occupational disease if it is "established by clear and convincing evidence" that it "arose out of and in the course of employment . . . and did not result from

13

causes outside of the employment," and that "[i]t follows as an incident of occupational disease" or "[i]t is characteristic of the employment and was caused by conditions peculiar to such employment."  Code § 65.2-401.

With regard to whether Mottram's PTSD is an occupational disease or an ordinary disease of life, the Employer argues that PTSD does not result solely from occupational stresses.  Instead, the Employer contends that PTSD can be caused by exposure to traumatic events found in everyday life, such as violent personal assaults, severe automobile accidents, or being diagnosed with a life threatening illness.  However, the Employer acknowledges that, of the six statutory factors required to establish an occupational disease, only number four is at issue in this appeal, whether PTSD is a disease to which Mottram may have had substantial exposure outside of his employment.  See Code § 65.2-400(B).

We agree with the observation of the Court of Appeals in Knott v. Blue Bell, Inc., 7 Va. App. 335, 338, 373 S.E.2d 481, 483 (1988), that "the question whether a condition or disease is an ordinary disease of life [or an occupational disease] is essentially a medical issue to be decided by the trier of fact based on the evidence presented."  Accord Marcus v. Arlington County Bd. of

<u>Supervisors</u>, 15 Va. App. 544, 550, 425 S.E.2d 525, 529 (1993). Contrary to the Employer's argument, the focus is not on the many causes of PTSD and whether some of them may be found outside of an employment situation. Instead, the focus must be on the nature of the employee's occupation and the relationship between that occupation and the specific disease, as contrasted to diseases that are readily found in other occupations or ordinary life. <u>See</u> 3 Arthur Larson, <u>Larson's Workers' Compensation Law</u> § 52.03[2] (2001). In this case, Dr. Frank emphasized that Mottram's PTSD was "intimately related to his service-connected activities." Moreover, there is no evidence that Mottram was exposed to traumatic events outside his employment. Thus, based on the record in this case, we conclude, as a matter of law, that Mottram's PTSD is an occupational disease under Code § 65.2-400. <u>See</u> <u>Mims v. McCoy</u>, 219 Va. 616, 618, 248 S.E.2d 817, 818 (1978)(where the evidence was not in conflict, whether an individual was a covered employee entitled to workers' compensation benefits was a question of law for the court).

In reaching this decision, we acknowledge, as did the Court of Appeals, that PTSD may be compensable as an injury by accident, depending on the circumstances under which the condition developed. <u>Mottram</u>, 35 Va. App. at 93, 542

15

S.E.2d at 814.  See also Burlington Mills Corp. v. Hagood, 177 Va. 204, 210-11, 13 S.E.2d 291, 293 (1941) (traumatic neurosis caused by sudden shock or fright without any physical impact may be compensable as an injury by accident).  We also recognize that PTSD is, in some situations, an ordinary disease of life.  See, e.g., Teasley v. Montgomery Ward & Co., 14 Va. App. 45, 49-50, 415 S.E.2d 596, 598-99 (1992) (employee's PTSD was an ordinary disease of life because employee had numerous sources of stress outside of the employment that contributed to his condition).  However, we emphasize that the credible evidence in this case establishes that Mottram's PTSD is an occupational disease.  In other words, each case turns upon its own facts.

CONCLUSION

For these reasons, we will affirm that part of the Court of Appeals' judgment finding that Mottram's PTSD is a disease, but will reverse that part of the judgment holding that it is an ordinary disease of life.  Finding that Mottram's PTSD is an occupational disease under Code § 65.2-400, we will enter judgment in favor of Mottram and remand this case to the Court of Appeals, with the direction that the case be remanded to the Commission for

16

the purpose of calculating the amount of Mottram's workers' compensation benefits.

<u>Affirmed in part</u>,
<u>reversed in part</u>,
<u>and remanded</u>.
