# Staunton

## John J. Lawson v. Fannie Darter.

September 17, 1931.

Present, Prentis, C. J., and Campbell, Holt, Epes, Hudgins and Gregory, JJ.

The opinion states the case.

*George L. Taylor*, for the plaintiff in error.

*R. P. Bruce* and *Morton & Parker*, for the defendant in error.

HOLT, J., delivered the opinion of the court.

On September 29, 1929, Fannie Darter was driving her automobile, a six-cylinder Studebaker coupe, along Main street in the town of Appalachia, and in the direction of which is known as Kentucky avenue. She was followed by John J. Lawson in his car, a six-cylinder Nash coupe.

It was her intention to make a U turn at the intersection of these two streets and to proceed back over Main street in the direction from which she had come. At this intersection there was, for the guidance of traffic, what is known as a "mushroom" around which cars were expected to pass in turning. Her evidence is that she was immediately followed by a third car, which, as she started to turn, passed her from her rear to her right. The defendant's evidence is that there was no intervening car, but that he was immediately behind her and at about a car's length distance. The speed of neither of these cars was excessive.

The plaintiff states that when about fifty or sixty feet from the point of turning she gave the proper signal to indicate her purpose. Code, section 2145 (19). In this she is corroborated by other witnesses. The defendant, who was likewise corroborated, said that she gave no signal whatever. In turning she slowed down and when her car was squarely across the street and opposite this "mushroom"

it came almost to a full stop. The defendant's car was then following and near the middle of the street, and according to the testimony of some witnesses, passed over the "mushroom." It struck the Studebaker coupe, broke its runningboard, and so bent the frame that a door could not be opened. Its own headlight and bumper were also broken. Miss Darter was bruised on her arm, hip and leg and cut a little about the chin. She did not then deem her injuries important and said so, but in the night following pain in her back developed, and a physician was summoned who called to treat her on the following morning. She was confined to her home for two or three months, not "in bed all that time, just in and out of bed." Her evidence is that she has lost considerable weight and is still very nervous, and that while she went to work in December following, is still below par and keeps going with difficulty. She testified that:

"Prior to this accident my health was good; I was strong; I never was such a robust woman, but still I had good health and really right at the time I did not realize I was injured so much, but the next morning it begun to show up on me, and I think it was not over two weeks until my menstrual periods came on me, and lasted from then to about three weeks that time, and I got relief for a short time only, and about the week after that it came on again, and it has been that way almost continuously, any time I do anything like sweeping it brings it on me, and any kind of house work other than washing dishes or anything like that hurts me every time I do it, and I have been under the doctor practically ever since the accident, and when I went to work in December, my physician told me not to go, but I have no other means of support only my labor and I did not feel like going to work when I did."

There was a verdict for $5,000.00, which was confirmed by the trial court.

■ It was first said that the court was in error in refusing to set this verdict aside as contrary to the law and the evidence.

If we are to accept as true evidence tendered on behalf of the plaintiff, she, at the proper time and in a proper way, signaled her purpose to make this U turn. This signal the defendant saw, or should have seen. He disregarded it and continued ahead without checking his speed until it was too late. In this he was negligent, while the plaintiff was not negligent because she had done all that the law required of her.

■ The jury and the trial court accepted her account of this accident, and it is our duty to accept it also if there is material testimony upon which it can rest. *Thomas' Case,* 106 Va. 855, 56 S. E. 705; *Cobb* v. *Commonwealth,* 152 Va. 941, 146 S. E. 270; *Johnson* v. *Commonwealth,* 152 Va. 965, 146 S. E. 289; *Ballard* v. *Commonwealth,* 156 Va. 980, 159 S. E. 222, decided June 18, 1931.

The plaintiff was plainly entitled to some verdict.

It is next said that the court erred in allowing a photograph of the plaintiff to be introduced in evidence.

■ ■ This photograph was taken a year before the trial and is an ordinary one of a young lady apparently in good health. The assignment is based upon the fact that it was not introduced by the photographer who took it, and upon the further fact that photographs are often touched up, and at times are notoriously flattering.

The plaintiff's evidence, as we have seen, is that she had lost weight. Before the accident she weighed from 130 to 135 pounds, and at the time of the trial 113. Its purpose doubtless was that the jury might in a general way see the effect of the nervous strain under which she had labored.

It is not necessary that the photographer himself be sworn as a witness. All that is necessary is that the photograph be identified. *Spencer* v. *Looney,* 116 Va. 767, 82

S. E. 745, 16 Corpus Juris, section 1528; *Hughes* v. *State,* 126 Tenn. 40, 148 S. W. 543, Ann. Cas. 1913 D, 1262. "Photographs may be admitted to prove the physical condition of a person at a particular time." 22 Corpus Juris, section 1117. This assignment is not well taken.

Next it is said that: "The court erred in refusing to strike out the evidence of Dr. W. B. Peters with reference to displacement of the uterus, or womb, and as to what would follow such displacement, because the evidence did not show there had been a displacement."

Dr. W. B. Peters was introduced and qualified as an expert. His testimony, in part, is as follows:

"Q. Assuming, Doctor, a young lady thirty-seven years of age, weighed 130 to 135 pounds who had been very healthy all her life, except, of course, the usual cold, but whose menstrual periods had lasted about three days, and had always been regular, met with an automobile accident on the 29th day of September, 1929, and in that accident, while the person was seated at the steering wheel, another car struck her car, with such force as to break the bumper of the car, and rock or reel the car in which the occupant claims to have been injured, at least twice; that from that accident appeared a bruise on the back and on the hip and arm; that shortly after that, within a period of a few hours, she appeared very nervous, but immediately after the accident she said she was not hurt; that since that time the menstrual periods have extended for a period of three weeks out of a month; that one or two months they have gotten down to ten or twelve days of the month; that the day following the automobile accident the party was driven a distance of approximately forty miles, and immediately following this accident was confined to her bed for two weeks, under the care of a regular qualified physician, and in and about the house for a period of about three months; that ever since that period of three months

the party is able to do light office work, but no sweeping or heavy work about the house, without ill results, and has lost weight from 130 to 135 to 113 pounds, and appears nervous, and the menstrual periods are as I have stated, is there any connection between that and the automobile accident?

"A.   Yes, sir.

"Q.   Why?

"A.   The violence of the blow more than likely produced a displacement of the uterus, the fright and fear brought on the flow immediately; due to this displacement the circulation of the uterus is disturbed, and you will have a continuous trouble there as long as this uterus is displaced.

"Q.   Is there any way of correcting it with medicine?

"A.   No, sir.

"Q.   What is the usual and proper practice or method of correcting this?

"A.   Shortening the ligaments so as to hold the uterus in its proper place.

"By Mr. Taylor:

"We object to this evidence, for the reason Dr. Peters has not made any examination of this lady and he does not know whether there is any displacement of which he speaks.

"By Mr. Parker:

"He is speaking as an expert.

"By the court:

"Objection over-ruled."

Again this witness said: "Excessive menstruation is nothing but a loss of blood, and it don't take a physician to explain to any layman that the loss of blood will weaken and when we lose amounts that a woman usually loses during the menstrual period, for three weeks, instead of three or four days, it is impossible for the food intake to rebuild that blood, then we have the loss of blood making the woman more nervous, and the nervousness making the woman lose

more blood—we have a vicious circle—one makes the other worse."

This witness was also of the opinion that the case would get worse instead of better, and that an abdominal operation was necessary to effect a cure.

It will be noted that no objection was made to the hypothetical question.

In the reply brief filed in behalf of the defendant, it is said: "It is true that counsel for defendant made no objection to the hypothetical question asked Dr. Peters by counsel for plaintiff, because such question fairly summed up the evidence on which the opinion of the doctor was desired, but our objection was to the testimony of Dr. Peters in which he assumed, as a matter of fact, that there has been a displacement of the uterus as a result of the accident."

We are not undertaking to pass upon the weight of this evidence. That was for the jury. Its competency was for the court.

It is true that this physician made no physical examination, and it may be, as a matter of fact, that a physical examination was necessary before any definite opinion as to this displacement could be formed, but this expert did not think so, and we cannot as a matter of law say that he was wrong.

If one would say to a qualified expert that some man seemed to be affected with partial paralysis from his waist down; that the movement of his legs was not coördinated, and that he walked with an ataxic gait, plainly that expert might then testify that these symptoms would seem to indicate locomotor ataxia. He might likewise say that this malady had its origin in some specific cause, and give his judgment as to its prognosis.

In *Barker* v. *Ohio River R. Co.*, 51 W. Va. 423, 41 S. E. 148, 152, 90 Am. St. Rep. 808, the court said: "Defendant ex-

cepts to the physician's evidence because he is permitted to give his opinion that the plaintiff's condition might have been caused by a shock, a fall, or anything that produces a shock to the spinal column. By other evidence this condition was connected with the accident. It is expert evidence, and not objectionable." And in support of this statement cited *Turner* v. *City of Newburgh*, 109 N. Y. 301, 16 N. E. 344, 347, 4 Am. St. Rep. 453.

In this last case the court said: "We think that, for the proper application of that rule, it is perfectly competent to furnish the jury with evidence of the present physical condition and bodily sufferings, and with the opinions of competent physicians as to whether such could have resulted from the accident, and as to their permanence."

In *Hylaman* v. *Midland Ins. Co.*, 136 Minn. 132, 161 N. W. 385, 387, it appears that the plaintiff was struck on his head while riding a bicycle. His skull was fractured. The doctor was asked how far a man could ride after receiving such an injury. He was permitted to answer, and it is a matter of indifference whether this expert saw the wound himself or had it accurately described to him.

The court in its opinion, quoting from Thayer on Evidence, page 525, said: "There is ground for saying that in the main, any rule excluding opinion evidence is limited to cases where, in the judgment of the court, it will not be helpful to the jury. * * *. It is obvious that such a principle must allow a very great range of permissible difference in judgment, and that conclusions of that character ought not, usually, to be regarded as subject to review by higher courts." See also Wharton & Stille's Medical Jurisprudence, volume 3, page 578.

Where personal observation is had, there is no occasion to present to the witness questions in hypothetical form.

In Wigmore on Evidence, section 674, it is said: "The first corollary of the theory of hypothetical questions, then,

is that *actual personal observation,* hitherto assumed as in general necessary for a witness, *is not needed* where the testimony consists in conclusions drawn from premises, but is replaced by the consideration or examination of those premises; and this consideration of the premises may be afforded by presenting them hypothetically to the person who is to draw conclusions from them. In other words, the same person need not testify to both premises and conclusion. This general principle is now universally accepted; but it is worth while to mark it at the outset." See also Bouvier's law dictionary.

This physician might have himself made a physical examination of the plaintiff. He might then, testifying as an expert, have stated to the jury the results of that examination. He might, moreover, have told them what, in his judgment, would be likely to follow from the situation as he had found it. In such a case there would have been no necessity for the formulation of any hypothetical questions, although it might have been done.

In matters of this kind which are not of common knowledge we must accept the opinion of experts. There is no other way in which an intelligent conclusion can be reached, and so evidence of this kind is competent unless it is palpably absurd, and it is not made incompetent by the fact that other experts may have reached another conclusion. Always it should be scrutinized with care, but the manner in which it is weighed has nothing to do with its admissibility.

The court did not err in permitting it to go to the jury.

█ Next it is said that instructions 1, 2, 3 and 4 should not have been given because there was nothing in the record to justify the claim of reckless driving on the part of the defendant.

If this defendant followed the plaintiff down an open street in open day and failed to observe a turning signal

from the car ahead, given in ample time and in a proper way, then he was negligent and in that sense reckless, and whether we term it negligence or recklessness the defendant would still be liable. The term "reckless," when we come to deal with drivers, should not be applied to Jehu only.

■■ Finally, it is said that the verdict is excessive. It is certainly excessive if the facts do not conform to the plaintiff's claim, and it should be readily conceded that the evidence is not entirely satisfactory, but the jury believed it, and the trial judge who heard and saw the witnesses believed it, and we must accept it unless it is plainly wrong. The authorities on this subject are collected in the case of *Colonna Shipyard, Inc.* v. *Dunn*, 151 Va. 740, 145 S. E. 342, 350. Judge Chinn, speaking for the Special Court of Appeals said: "The settled rule is that, as there is no legal measure of damages in cases involving personal injuries the verdict of the jury in such cases cannot be set aside as excessive unless it is made to appear that the jury has been actuated by prejudice, partiality, or corruption, or that they have been misled by some mistaken view of the merits of the case."

If what the plaintiff said is true, and if what the physician said is also true, then we cannot say that this verdict is so excessive as to clearly show that it is the product of partiality, or prejudice, or that the jury had been misled by some mistaken view of the merits of the case. *Norfolk, etc., Belt Line Railroad Co.* v. *Parker*, 152 Va. 484, 147 S. E. 461.

We find no reversible error in the judgment appealed from. It is, therefore, affirmed.

*Affirmed.*