# Richmond

ROBERT W. WAITT, JR. v. COMMONWEALTH OF VIRGINIA.

June 13, 1966.

Record No. 6198.

Present, All the Justices.

F. *Byron Parker* (*Parker and Lane,* on brief), for the plaintiff in error.

*M. Harris Parker, Assistant Attorney General* (*Robert Y. Button, Attorney General,* on brief), for the Commonwealth.

BUCHANAN, J., delivered the opinion of the court.

A grand jury of the Hustings Court of the City of Richmond, on October 5, 1964, returned an indictment against the apellant, Robert W. Waitt, Jr., herein referred to as defendant, charging him with the rape of Janet Lorraine Campbell, an infant fourteen years old. Code § 18.1-44.[1]

On his trial a jury found him guilty and fixed punishment at five years in the penitentiary. He was sentenced accordingly and we granted a writ of error. Among other assignments of error he here alleges that the verdict of the jury was contrary to the law and the evidence.

The defendant, who was forty-four years old at the time of his trial in February, 1965, had married Martha Lorraine Campbell in January, 1956, of which marriage a son, Robert, was born. It was his third marriage and her second. She was divorced from her first husband, by whom she had two daughters, Janet, born December 20, 1949, and Theresa, who was a year younger. At the time of the alleged offense the defendant, his wife and the three children lived in

---

(1) "If any person carnally know a female of sixteen years of age or more against her will, by force, or carnally know a female child under that age * * he shall, in the discretion of the court or jury, be punished with death, or confinement in the penitentiary for life, or for any term not less than five years. But if such female child be between the ages of fourteen and sixteen years * * and consents to the carnal knowledge, the punishment shall be confinement in the penitentiary not less than one nor more than twenty years."

a home on Newport Drive, in Richmond. The bedrooms were on the second floor, reached by a stairway. The bedroom of the two girls was across the hall opposite the bedroom occupied by the defendant and his wife. The son's room was on the same side as that of the girls, and a maid's room was on the same side as that of the defendant and his wife.

Janet Campbell, defendant's stepdaughter, testified that on a Sunday afternoon in January or February, 1964, between one and three o'clock in the afternoon, when she was taking a nap in her bed and was lying on her stomach under the covers, the defendant came in, rolled her over, took her pants off and had intercourse with her. Asked whether she made any protest at the time, she replied that she did not guess she did; that "He has forced himself on me so many times that I just—I don't know. I was just giving up hope saying no. * * I thought he would hurt the family in some way, or —well, hurt me, or my mother, or somebody." She said she was afraid of him. She was asked what her feeling was toward him at that moment and she answered, "Oh, I hated him." She made no disclosure of the matter until the happening on the following July 12.

In the early morning of July 12, 1964, so Janet testified, after her mother and defendant had gone to a party earlier that night, she and her sister Theresa went to their room about ten-thirty or eleven o'clock, shut their door and went to sleep. Later, sometime after twelve o'clock, the defendant came and got in bed with her. He told her to take off her pants but she refused, and he began to feel parts of her body. He told her again to take her pants off but she said "No. No. No." and he then started to get on top of her, but her sister got up and said, "Bob, will you please get off of Janet," and ran out into the hall. Defendant then jumped out of the bed "real quick" and ran into the hall. "He had on just a strap." Her mother met him in the hall. Theresa was all upset and crying. Her mother said, "Theresa, honey, what's the matter?" Theresa replied, "Mom, Bob was on top of Janet." Her mother then called the police.

Mrs. Waitt, Janet's mother, said that around nine-thirty that night she and the defendant went to the home of a friend, where they had drinks, and left there about two or two-thirty. When they returned home the defendant left to get the Sunday morning newspaper. She went in, saw that the girls were all right, closed their door and went to bed and to sleep. She was awakened between three-thirty and four o'clock by Theresa's screaming, "Mama, Mama, please come

in here and get Bob off the top of Janet." By the time she got into the hall the defendant was coming out of the children's bedroom with his jockey strap on and had turned the hall light on. The children were greatly upset, she went into their room to try to calm them and by then the defendant had got into bed. She told him she was going to call the police, and did so. A police officer came and talked to her and to the girls. Later that day Mrs. Waitt left the home, took the girls with her, and they have not lived with the defendant since.

The officer arrived about 4:30 a.m., he testified, talked with Mrs. Waitt and the two girls, and advised Mrs. Waitt to confer with the Commonwealth's attorney.

Theresa, the younger sister of Janet, testified that she was awakened that morning by the turning of the doorknob and defendant walking in. He went over to Janet's bed and got in and she heard a sound like skin scraping together. Then he started whispering to Janet and asking her to take off her pants. He kept begging her and she said no. Then he started to get on top of her. She, Theresa, screamed to him to get off of Janet and ran to her mother's room, but met her mother in the hall. She said the defendant had on a jockey strap.

Dr. William T. Moore examined Janet on July 16, 1964, and found what he called a marital vagina. He said the hymen was dilated sufficiently large to admit two fingers and permit the use of instruments normally used for examining married women, a condition that could have been caused by the male organ, but that it could have been made by other means and he could not say that she had had intercourse with anybody.

Defendant, who for the past four years had been the Executive Secretary of the Richmond Centennial Commission, categorically denied having ever had any sexual relations with Janet or any other girl. He undertook to account for his activities on each Sunday in January and February, 1964, to show his lack of opportunity to commit the alleged offense. In support of this contention he introduced statistical records of his employment and his appointment book. He also introduced some twenty character witnesses, who testified that his reputation for truth and veracity was good and that they would believe him on oath. However, the records of his activities were kept by him and in his possession, and were not conclusive; and his evidence failed to convince the jury that he was telling the truth.

He introduced testimony to the effect that he and his wife had frequent quarrels; that she had struck him at various times and had said in the presence of others that she would see him in jail or the penitentiary before she would let him divorce her.

As to the July 12 incident, defendant testified that he returned home with the newspaper and after reading some of it he went upstairs and into his bedroom at about 4 a.m. and was getting ready for bed when he heard one of the girls call, "Bob, Bob," and he answered that he was coming; that he walked over to their bedroom, the door of which was open, and Janet said, "Bob, it's me," and he walked in the direction of her bed; that when he got to the foot of Theresa's bed "Theresa jumped up and says, Mom, Mom, Bob's raping Janet." His first reaction to that was that the child was having a nightmare, or something; that she kept on yelling so he turned and walked into the hall to get his wife to come in and quiet Theresa; that he met his wife in the hall and she shook her finger at him and said, "Bob, I have been suspecting this for a long time. Now I have got you, caught you."

He testified that on the Saturday evening preceding July 12 he was in the living room reading and Janet was there sitting in a chair when Theresa came in, walked over to Janet, started whispering, and he heard her say, "This is the night we are going to get Bob." He said, "I looked up at them with a very startled expression. They saw me looking, and she changed the subject." They were looking at the green sheet of the newspaper, which he said he identified "because here are my initials on it that I put right after —." Both girls denied that any such thing occurred.

In his brief the defendant states: "The defendant's theory was that his wife and stepchildren, who hated him, were out to send him to the penitentiary and take his property." It was a theory that found little support in the evidence. It was rejected by the jury, which found him guilty of the charge, and it is clear from the record that the evidence was sufficient to support their verdict.

The remaining assignments of error relate to procedural matters, discussed below, and we find them to be without merit.

■ Defendant moved to quash the indictment because it did not state the time of the offense. It charged that the offense occurred without sixteen months prior to the finding of the indictment. The Commonwealth filed a bill of particulars which stated that it occurred between one and three o'clock on a Sunday afternoon in the month of January or February, 1964.

Section 19.1-172 of the Code provides that no indictment shall be quashed or deemed invalid for omitting to state, or stating imperfectly, the time at which the offense was committed when time is not the essence of the offense. There was no dispute as to Janet's age and time was not the essence of the offense charged against the defendant. *Lear v. Commonwealth*, 195 Va. 187, 77 S.E.2d 424. The indictment supplemented by the bill of particulars sufficiently identified the offense charged and the motion to quash was properly overruled. *Hudgins v. Commonwealth*, 142 Va. 628, 128 S.E. 565; *Ward v. Commonwealth*, 205 Va. 564, 138 S.E.2d 293.

█ Defendant now complains of the admission of the testimony of the event of July 12, 1964. He did not object to it at the trial and objection is not available to him now. Rules of Court, 1:8. Not only was it not objected to, but after Janet and Theresa had both testified to this occurrence without objection, Mrs. Waitt was asked about it. Defendant objected to her testifying to anything the children might have told her, but said, "If she herself of her own knowledge knows something that happened in January and February, I think she can testify to it." Her testimony was within that agreed limit. The court specifically instructed the jury that this evidence was not to be considered for any purpose other than as it might tend to show the disposition of the defendant with respect to the particular act charged. *Stump v. Commonwealth*, 137 Va. 804, 119 S.E. 72. Defendant has nothing to complain about on this point.

█ Neither is there merit to his objection to the testimony of Dr. William T. Moore as to his examination of Janet, on the ground that it was too remote. The physical condition of the child was relevant to the inquiry and something the jury would want to know about. Its remoteness would affect its probative value rather than its admissibility and it was for the jury to decide under all the evidence whether the defendant caused or contributed to the condition. *Loving v. Commonwealth*, 165 Va. 761, 182 S.E. 224; *State v. Friend*, 100 W. Va. 180, 130 S.E. 102.

█ Defendant complains at greater length about the court's refusal to admit in evidence the opinion of a psychiatrist on whether Janet's testimony was fact or fantasy. The witness was Dr. Joan Mason Meiller, who testified that she was a 1952 graduate of New York College of Medicine, worked part time on the staff at the Medical College of Virginia and was a consultant at Memorial Guidance Clinic, which deals with disturbed children and their parents.

She was asked whether a girl as described in the proposed hypothetical question would "have fantasies as far as sexual activity with her father." Objection to the question was followed by extended discussion out of the hearing of the jury as to what should be incorporated in the hypothetical question.

It was shown that the witness had never examined or talked to either of these children. Finally the question quoted in the margin[2] was put together and the court stated: "Then the question is whether or not you would say that she was suffering from hallucination." The witness replied as follows:

"A. Well, could I say something? That wouldn't have to be an hallucination. Children and adolescents, we find, have an ability to tell fact from fantasy.

"Q. Would you say that it was all a fantasy under those circumstances?

"A. It may be a dream or—

"Q. I mean, would you say it was fantasy then, that she was fancying a fact that her father—

"A. It certainly very well could be.

"Q. It could be?

"A. Certainly could."

On further discussion the court ruled that this was not proper evidence and refused to allow the question. The ruling was obviously correct. The question omitted important details of the evidence and incorrectly stated others, as appears from the above statement of the evidence. Janet said that she hated the defendant "at that moment," referring to the time she said the defendant had intercourse with her. She was asked on cross-examination, "Did you ever bite your fingernails?" She answered, "Yes, sir," and that was all the evidence on that subject.

(2) "Dr. Meiller, suppose you have a case history which exhibits the following factors: The girl is fourteen years old, the girl has lived with her stepfather, her mother having divorced her father to marry this man for a period of seven or eight years, and the girl lived in the home, that the girl has made the statement that she hated her stepfather, that the girl bites her fingernails, that the stepfather and mother have arguments in the home, that the girl has said that she has had intercourse in January or February while she was fourteen with her stepfather, that a doctor has examined her in July, on July 16 of 1964, and the doctor has stated that she has been penetrated by something—which could be a male organ, which could be tampax, or whatever you call it—it could be her fingers, or it could be some other object, that at some time after midnight, the girl said that her stepfather was in bed with her and was attempting to make—told her to take her pants off—And that her sister was in the other bed with her and immediately went out in the hall and aroused her mother."

The defendant testified that he overheard the two girls plotting this scheme. This was omitted from the proposed question but was capable of having important effect on the opinion which the witness was asked to express. The answer, "It certainly very well could be" given by the witness to the proposed question, without any knowledge or examination of Janet and on only a partial view of the evidence, could not have been helpful to the jury and was improper and inadmissible. *Cf. Strawderman* v. *Commonwealth*, 200 Va. 855, 108 S.E.2d 376;[3] *Adams* v. *Ristine*, 138 Va. 273, 122 S.E. 126; *Dejarnette* v. *Commonwealth*, 75 Va. 867.

While the modern trend of judicial decision favors admission of expert opinion "having a bearing on the ultimate issue of fact," Annotation, 66 A.L.R.2d 1082, 1112,[4] and personal examination of the subject is not always necessary, *Lawson* v. *Darter*, 157 Va. 284, 160 S.E. 74, an opinion given without any examination of, or acquaintance with, the subject and formed on the basis of incorrect and incomplete information, is not an opinion on which a jury should rely and it does not constitute admissible testimony.

"It is, of course, true that a hypothetical question to an expert witness must embody all the material facts which the evidence tends to prove, affecting the question upon which the expert is asked to express an opinion. *Tate* v. *Chumbley*, 190 Va. 480, 496, 497, 57 S.E.2d 151, 159." *Ames & Webb, Inc.* v. *Commercial Laundry*, 204 Va. 616, 621, 133 S.E.2d 547, 550, 551.

Defendant next complains of the court's refusal to give certain

---

(3) "The competency of expert testimony depends upon the question as to whether or not any peculiar knowledge, science, skill, or art, not possessed by ordinary persons, is necessary to the determination of the matter at issue. In other words, expert testimony is not admissible as to matters within the experience or knowledge of persons of ordinary information as to which the jurors are competent to draw their own inferences from the evidence before them without extraneous aid other than the instructions of the court upon the questions of law involved. * *" 200 Va. at 859, 108 S.E.2d at 379, 380.

(4) "The prevailing modern rule favors admission of expert opinion evidence as to the cause of death, disease, or other physical condition, at least when it is not a pure conclusion without reference to immediate and connecting causative factors and antecedents but is submitted rather with reference thereto and based upon supporting evidence in the record, even though controverted and having a bearing on the ultimate issue of fact, and when it is derived from either the personal observation of, or a proper hypothetical question put to, the witness, where it can be seen with reasonable clarity, from the nature of the subject matter as either wholly scientific or in a measure beyond the scope of knowledge of the average juror, that it will help the jury reach a sound verdict and not tend to confuse them, and hence not invade their province of fact finding."

instructions requested by him. These had to do with burden of proof and methods of considering testimony, adequately covered by other instructions; and the necessity of proving intent, which was not applicable. The court gave nine instructions which fully and fairly instructed the jury as to the law of the case, and the refusal of these additional instructions involved no error.

Finally defendant says in his brief that he did not discover until after the verdict, he does not state how long after, that a member of the jury had been committed in 1957 to a hospital as mentally ill but later discharged as "recovered," and that he had requested permission of the court to explore the matter, which was not given. The record before us makes no reference to this occurrence, and it is not a matter of inquiry on this appeal.

We find no error in the trial and the judgment appealed from is

*Affirmed.*