CLEMENTS, J.,
with whom FITZPATRICK, C. J., BENTON, ELDER and ANNUNZIATA, JJ., join, dissenting.
For the reasons that follow, I would hold that the commission erred in denying Artis’s claim for temporary partial disability benefits following his termination from selective employment provided by employer. Hence, I respectfully dissent from the majority’s analysis and conclusion.
The sole issue before the commission was whether Artis was entitled to partial disability compensation following his termination from selective employment. Concluding, as the majori *94 ty notes, “that Artis failed to carry his burden of proving that his termination was attributable to his disability,” the commission found as follows:
The evidence in this case establishes that the claimant was under some restrictions at the time of his discharge. He was discharged after he feigned a robbery with the intent to harm an individual employed by the employer. Dr. Harris implicated a variety of factors which led to this behavior, including the claimant’s frustration and anger. A close review of Dr. Harris’s contemporaneous treatment notes, as well as the claimant’s testimony, demonstrates that the claimant’s main problems were not directly related to his accident. The claimant’s problems involved anger at his employer, and frustration over his financial status and his ongoing situation relative to perceived problems with accommodations and other employment issues not directly related to the initial trauma. These problems are of a nature more akin to stress resulting from an employee’s interaction with his supervisors, which is not compensable. See Teasley v. Montgomery Ward & Co., 14 Va.App. 45, 415 S.E.2d 596 (1992). We also note that the documentary [evidence] reveals pre-existing problems with anger or “rage,” despite the claimant’s denials to the contrary.
We find that the totality of the evidence shows that the claimant was responsible for his wrongful actions on June 29, 2000. Under the circumstances presented, we agree that the claimant was discharged for justified cause, supporting the forfeiture of benefits.
On appeal, Artis does not challenge employer’s right to terminate him for feigning the robbery. He argues, however, that his termination from selective employment did not justify a forfeiture of subsequent disability benefits because the evidence in the record supports no other conclusion than that his feigning the robbery was directly attributable to the post-traumatic stress disorder he suffered as a result of the October 2, 1999 compensable industrial accident. Thus, he contends the commission erred, as a matter of law, in finding that his post-termination wage loss was not causally related to his *95 compensable psychiatric disability and in ruling, based on that finding, that his discharge “for justified cause” precluded him from receiving the requested post-termination wage-loss benefits.
Employer concedes on appeal, as it did below, that, as a result of his industrial accident on October 2, 1999, Artis suffered a compensable psychiatric injury that was diagnosed as post-traumatic stress disorder. Employer maintains, however, that, because credible evidence supports the commission’s finding that Artis’s feigning the robbery was attributable to his “pre-existing problems with anger” and “the stress that resulted from his interaction with employer, [and] not his work-related accident,” this Court is bound by that finding. Because it is unrelated to the compensable accident, such stress, employer argues, in reliance on Teasley, 14 Va.App. 45, 415 S.E.2d 596, provides no basis for post-termination disability benefits. Consequently, employer concludes, the commission correctly determined that Artis’s willful misconduct justified the forfeiture of compensation benefits.
The determination whether the commission erred in concluding that Artis’s feigning the robbery “justified a forfeiture of his disability benefits” requires consideration of two inquiries: First, whether an injured employee’s termination for cause from selective employment provided by the employer automatically bars the employee from receiving post-termination wage-loss benefits and, second, whether sufficient evidence exists to support the findings of the commission.
I.
In affirming the commission’s decision, the majority, quoting Walter Reed Convalescent Ctr. v. Reese, 24 Va.App. 328, 336-37, 482 S.E.2d 92, 97 (1997), holds that, when an employer discharges a partially disabled employee from selective employment for misconduct, “all that is required” to “ ‘justify ... a forfeiture of [post-termination] compensation benefits’ ” is a “showing: (1) that the [fired employee’s] wage loss is ‘properly attributable’ to the [employee’s] wrongful act; and (2) that the *96 employee is ‘responsible’ for that wrongful act.” I believe that, in reaching this conclusion, the majority misconstrues the applicable case law, which, in my view, also requires that the fired employee’s wrongful act is not properly attributable to his or her work-related injury.
The so-called “termination for cause” doctrine had its genesis in Goodyear Tire & Rubber Co. v. Watson, 219 Va. 830, 252 S.E.2d 310 (1979), and Marval Poultry Co. v. Johnson, 224 Va. 597, 299 S.E.2d 343 (1983). In Watson, the claimant was fired by the employer because of his unsatisfactory selective work habits and performance. 219 Va. at 832, 252 S.E.2d at 312. The commission decided that the claimant was entitled to a resumption of benéfíts following his termination because, inter alia, his poor selective work performance “ ‘could well [have been] attributable’ ” to his work-related injury. 219 Va. at 833, 252 S.E.2d at 312. Finding no support for the commission’s decision in the record, the Supreme Court of Virginia reversed the award, stressing that, “[w]hen [the claimant’s] actions and conduct in connection with his selected work ... [were] considered, it [could not] be inferred from any evidence in the record that [he] was discharged as a result of his ... injury.” Id. at 833, 252 S.E.2d at 312-13 (emphasis added).
In Johnson, the claimant was discharged from selective employment for dishonesty. 224 Va. at 599, 299 S.E.2d at 344. The Supreme Court reversed the commission’s decision awarding post-termination benefits, stating that “there [was] nothing in the record from which it [could] reasonably be inferred that [the claimant] was dismissed because of his [accident-related] tendonitis.” Id. at 601, 299 S.E.2d at 345 (emphasis added).
Examining Watson and Johnson, among other cases, this Court held in C & P Telephone Co. v. Murphy, 12 Va.App. 633, 639-40, 406 S.E.2d 190, 193, aff'd en banc, 13 Va.App. 304, 411 S.E.2d 444 (1991), that, under former Code § 65.1-63 (now Code § 65.2-510),
where a disabled employee is terminated for cause from selective employment procured or offered by his employer, *97 any subsequent wage loss is properly attributable to his wrongful act rather than his disability. The employee is responsible for that loss and not the employer. In this context, we are unable to find any provision within the Workers’ Compensation Act which evidences an intent by the legislature to place such an employee in a better position than an uninjured employee who is terminated for cause and by his wrongful act suffers a loss of income.
However, the forfeiture rule set forth in Murphy has subsequently been “limited to its factual context,” Tumlin v. Goodyear Tire & Rubber Co., 18 Va.App. 375, 380, 444 S.E.2d 22, 24 (1994), and found not to bar a claimant discharged from selective employment for willful misconduct from receiving post-termination wage-loss benefits when the wage loss is “properly attributable” to the claimant’s “disability caused by a compensable industrial accident,” Potomac Edison Co. v. Cash, 18 Va.App. 629, 633-34, 446 S.E.2d 155, 157-58 (1994). As this Court noted in Cash, “[t]he underlying premise of the rule in Murphy is to hold employees responsible only for any wage loss properly attributable to their wrongful conduct[;] ... decisions of this Court rendered after Murphy establish that termination for cause is not the sole issue in determining eligibility for benefits under the Act.” Id. at 633, 446 S.E.2d at 157 (emphasis added).
Indeed, citing Watson and Johnson, this Court explained in Timbrook v. O’Sullivan Corp., 17 Va.App. 594, 597, 439 S.E.2d 873, 875 (1994) (emphases added) (citations omitted), that
an employee on selective employment offered or procured by the employer, who is discharged for cause and for reasons not concerning the disability, forfeits his or her right to compensation benefits like any other employee who loses employment benefits when discharged for cause. The reason for the rule is that the wage loss is attributable to the employee’s wrongful act rather than the disability.
Thus, a discharge from selective employment does not “create a forfeiture of workers’ compensation benefits” if “the reason *98 for the discharge ... concernís]” the employee’s disability. Id. at 598-99, 439 S.E.2d at 876.
In Eppling v. Schultz Dining Programs, 18 Va.App. 125, 130, 442 S.E.2d 219, 222 (1994), this Court held that, even if the termination is based on a -wrongful act by the employee, not every “type of willful conduct or misbehavior [arises to the level] that, upon termination, justifies a forfeiture of workers’ compensation benefits [under Murphy].” As this Court explained:
When a disabled employee is discharged from selective employment, the “inquiry focuses on whether the claimant’s benefits may continue in light of [the] dismissal.” Richmond Cold Storage Co. v. Burton, 1 Va.App. 106, 111, 335 S.E.2d 847, 850 (1985). An employee’s workers’ compensation benefits will be permanently forfeited only when the employee’s dismissal is “justified,” the same as any other employee who forfeits ... benefits when discharged for a “justified” reason. Id.
A “justified” discharge (one which warrants forever barring reinstatement of workers’ compensation benefits) does not simply mean that the employer can identify or assign a reason attributable to the employee as the cause for his or her being discharged. Whether the reason for the discharge is for “cause,” see Murphy, 12 Va.App. at 639, 406 S.E.2d at 193, or is “justified” for purposes of forfeiting benefits must be determined in the context of the purpose of the Act and whether the conduct is of such a nature that it warrants a permanent forfeiture of those rights and benefits. “The [c]ommission ... must be mindful of the purposes and goals of the” Act. Burton, 1 Va.App. at 111, 335 S.E.2d at 850.
Id. at 128, 442 S.E.2d at 221.
“The fundamental purpose of the Workers Compensation Act ... [is] compensation for accidental injuries within the hazards of the employment.” Morris v. Morris, 238 Va. 578, 584, 385 S.E.2d 858, 861 (1989). Accordingly, the Act is intended
*99 to provide compensation to an employee for the loss of his opportunity to engage in work, when his disability is occasioned by an injury suffered from an accident arising out of and in the course of his employment. The Act should be liberally construed in harmony with its humane purpose.
Barnett v. D.L. Bromwell, Inc., 6 Va.App. 30, 33-34, 366 S.E.2d 271, 272 (1988) (en banc) (citation omitted).
Extrapolating from these principles, it stands to reason that, “in order to work a forfeiture” of post-termination wage-loss benefits under Murphy, the injured employee’s post-termination wage loss must be both “ ‘properly attributable to [the employee’s] wrongful act ... [for which the] employee is responsible,’ ” Eppling, 18 Va.App. at 129, 442 S.E.2d at 222 (alterations in original) (quoting Murphy, 12 Va.App. at 640, 406 S.E.2d at 193), and not properly attributable to the employee’s work-related injury, see Johnson, 224 Va. at 601, 299 S.E.2d at 345; Watson, 219 Va. at 833, 252 S.E.2d at 312-13; Cash, 18 Va.App. at 633-34, 446 S.E.2d at 157-58; Timbrook, 17 Va.App. at 597, 439 S.E.2d at 875. In other words, a claimant’s discharge from selective employment for willful misconduct does not, in itself, preclude the claimant from receiving post-termination wage-loss benefits if it is shown that the claimant’s misconduct was properly attributable to his or her work-related injury.[5] Eppling, 18 Va.App. at 128, 442 S.E.2d at 221. Thus, the determining factors in a case such as this are not solely the nature and willfulness of the misconduct that led to the injured employee’s termination, but also the nature of the relationship, if any, between that misconduct and the employee’s work-related injury.
For example, in Timbrook, this Court determined that an injured employee’s discharge from selective employment for *100 work-related misconduct did not bar her right to post-termination compensation benefits because, among other reasons, the employee “was discharged for a ‘reason[ ] concerning [her] disability.’ ” 17 Va.App. at 599, 439 S.E.2d at 876. Conversely, in Richfood, Inc. v. Williams, 20 Va.App. 404, 409, 457 S.E.2d 417, 419 (1995) (emphases added), this Court held that an injured employee who was discharged from selective employment for work-related misconduct was not entitled to further disability benefits because “the reason for [the employee’s] termination was unrelated to Ms injury and was due solely to his misconduct.” Likewise, in Reese, 24 Va.App. at 338-39, 482 S.E.2d at 97-98, this Court concluded that a partially disabled employee was not entitled to compensation for her post-termination wage loss because the employee’s termination from selective employment for her “repeated negligent errors” at work was not caused by her compensable injury. This Court further explained in Reese:
In this case, the evidence established as a matter of law that claimant’s wrongful acts ... and not her injury or disability, caused her wage loss. Thus, this loss was not employer’s responsibility. The evidence established that claimant’s termination was unrelated to her injury and was due solely to her misconduct.... In this case, credible evidence established that claimant’s failure to properly perform her job was caused by her incompetence, not her injury. No credible evidence showed that claimant’s mistakes were caused by her injury or its residual effects.
Id. (emphases added).
Accordingly, in order to prevail on his claim for post-termination workers’ compensation benefits in this case, Artis, having effectively conceded that he was properly fired for cause from selective employment provided by employer, had to prove by a preponderance of the evidence that his termination from selective employment was properly attributable to his October 2, 1999 compensable industrial accident “or its residual effects.” Id.; see also Hungerford Mechanical Corp. v. Hobson, 11 Va.App. 675, 678, 401 S.E.2d 213, 215 (1991) (holding that the claimant has the burden of establishing by a *101 preponderance of the evidence that he or she is entitled to compensation).
II.
The commission found that Artis’s discharge and resultant wage loss were not attributable to his October 2,1999 industrial accident but rather solely to his misconduct in feigning the robbery on June 29, 2000, for which he was responsible. In reaching that decision, the commission wholly rejected Dr. Harris’s opinion that “the feigned robbery ... resulted directly from ... Artis’s accident-related psychiatric condition.” Relying instead on Dr. Harris’s treatment notes and Artis’s testimony, the commission found that Artis’s misconduct was the result of his “anger at his employer, and frustration over his financial status and his ongoing situation relative to perceived problems with accommodations and other employment issues not directly related to the initial trauma.” Such problems, the commission found, were “of a nature more akin to stress resulting from an employee’s interaction with his supervisors, which is not compensable,” under Teasley, 14 Va.App. 45, 415 S.E.2d 596. The commission added that Artis had “pre-existing problems with anger or ‘rage.’ ”
The determination whether a claimant’s post-termination wage loss is causally related to his compensable injury by accident is a finding of fact. See Reese, 24 Va.App. at 335, 337, 482 S.E.2d at 96-97; Ingersoll-Rand Co. v. Musick, 7 Va.App. 684, 688, 376 S.E.2d 814, 817 (1989).
If there is evidence, or reasonable inferences can be drawn from the evidence, to support the Commission’s findings, they will not be disturbed on review, even though there is evidence in the record to support a contrary finding. Although the findings of the ... Commission, if based on credible evidence, are conclusive and binding upon us, the Commission's findings of fact are not binding upon us when there is no credible evidence to support them. The question of the sufficiency of the evidence then becomes one of law. The trier of fact must determine the weight of the testimony *102 and the credibility of the witnesses, but it may not arbitrarily disregard uncontradicted evidence of unimpeached witnesses which is not inherently incredible and not inconsistent with facts in the record.
Morris v. Badger Powhatan/Figgie Int’l, Inc., 3 Va.App. 276, 279, 348 S.E.2d 876, 877 (1986) (citations omitted). Thus, “[u]nless this Court determines that, as a matter of law,” Artis proved by a preponderance of the evidence that his termination from selective employment was properly attributable to his October 2, 1999 compensable industrial accident, the commission’s “contrary finding is binding and conclusive.” Owens v. Virginia Dept. of Transp., 30 Va.App. 85, 87, 515 S.E.2d 348, 349 (1999). “In determining whether credible evidence exists, the appellate court does not retry the facts, reweigh the preponderance of the evidence, or make its own determination of the credibility of the witnesses.” Wagner Enters., Inc. v. Brooks, 12 Va.App. 890, 894, 407 S.E.2d 32, 35 (1991).
Moreover,
[wjhether credible evidence exists to support a factual finding is a question of law which is properly reviewable on appeal. Causation is a factual determination to be made by the commission, but the standards required to prove causation and whether the evidence is sufficient to meet those standards are legal issues which we must determine. In considering whether credible evidence exists to support the necessary factual findings, we view the evidence in the light most favorable to the party prevailing below.
Hercules v. Gunther, 13 Va.App. 357, 361, 412 S.E.2d 185, 187 (1999) (citations omitted).
“A finding of causation need not be based exclusively on medical evidence. ‘The testimony of a claimant may also be considered in determining causation, especially where the medical testimony is inconclusive.’ ” Lee County Sch. Bd. v. Miller, 38 Va.App. 253, 260, 563 S.E.2d 374, 377-78 (2002) (quoting Dollar Gen’l Store v. Cridlin, 22 Va.App. 171, 176, 468 S.E.2d 152, 154 (1996)). Furthermore, while “[m]edical evidence is not necessarily conclusive, but ... subject to the *103 commission’s consideration and weighing,” Hobson, 11 Va.App. at 677, 401 S.E.2d at 215, “ ‘[i]n matters ... which are not of common knowledge [the trier of fact] must accept the opinion of experts. There is no other way in which an intelligent conclusion can be reached____’” Walrod v. Matthews, 210 Va. 382, 389, 171 S.E.2d 180, 185 (1969) (quoting Lawson v. Darter, 157 Va. 284, 293, 160 S.E. 74, 77 (1931)); see also Seneca Falls Greenhouse & Nursery v. Layton, 9 Va.App. 482, 487, 389 S.E.2d 184, 187 (1990) (noting, in reference to a neuropsychologist’s opinion regarding the causal connection between the claimant’s disabling mental condition and his industrial accident, that, in matters that “are not common knowledge, the court must accept the opinion of experts”); cf. Velazquez v. Commonwealth, 263 Va. 95, 103, 557 S.E.2d 213, 218 (2002) (observing that the purpose of expert testimony is “to assist the trier of fact to understand the evidence presented or to determine a fact in issue” in matters that require a “ ‘knowledge of a subject beyond that of persons of common intelligence and ordinary experience’ ” (quoting Neblett v. Hunter, 207 Va. 335, 339, 150 S.E.2d 115, 118 (1966))); Code § 8.01-401.3 (“In a civil proceeding, if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.”).
Further guidance is provided by the long-standing principle that,
when an attending [medical expert] is positive in his diagnosis of a disease, great weight will be given by the courts to his opinion. However, when it appears ... that the diagnosis is shaded by doubt, and there is medical expert opinion contrary to the opinion of the attending [medical expert], then the trier of the fact is left free to adopt that view which is most consistent with reason and justice.
Bristol Builders Supply Co. v. McReynolds, 157 Va. 468, 471, 162 S.E. 8, 9 (1932).
*104 Applying these principles to the instant case, I conclude that, as a matter of law, there is no credible evidence in the record to support the commission’s finding that Artis was discharged from selective employment for reasons unrelated to his compensable work-related accident. To the contrary, I find that all of the relevant credible evidence in the record plainly supports the conclusion that Artis’s action in feigning the robbery was directly related to his October 2, 1999 work-related accident.
The relevant evidence is undisputed. On October 2, 1999, Artis was involved in a traffic accident in which he unavoidably struck and killed a pedestrian with his delivery truck while working for employer. Because of that accident, Artis suffered from numerous emotional problems, including flashbacks of the accident, fear of driving and crossing the street, anxiety attacks, feelings of being a killer, trouble sleeping and getting out of bed, and problems maintaining an erection. Dr. Harris, a clinical psychologist who first treated Artis ten days after the accident and continued treating him several times a month thereafter through at least July 2000, noted at intake that, having suffered the accident, Artis was a “nervous, tense/anxious, depressed, agitated, phobic male who was fully oriented with sad, hopeless, and depressed affect, and depressed/irritable mood,” and who “was having trouble containing paranoid, hostile, and violent urges secondary to his anxious, agitated feelings.” Dr. Harris specifically diagnosed Artis as suffering from post-traumatic stress disorder directly caused by the October 2, 1999 industrial accident. Dr. Harris was positive in his diagnosis, and no evidence from any other mental health expert was provided to contradict that diagnosis. Employer accepted Artis’s psychological injury as compensable and voluntarily authorized and paid for treatment of that condition.
At no point between October 12, 1999, and June 29, 2000, did Dr. Harris release Artis to full employment or otherwise indicate that Artis had recovered from his accident-related psychological injury. To the contrary, as Dr. Harris noted in his contemporaneous treatment notes, although Artis was able *105 to achieve “brief periods of higher level driving function” at times, he continued to “need to temporarily self-modify his own driving exposure” when the symptoms of his disorder affected his ability to drive safely. Indeed, the commission noted that Artis was still on selective employment at the time of the feigned robbery. Moreover, Dr. Harris’s treatment notes indicate that Artis’s underlying mental disorder continued throughout that period and adversely affected his ability to problem solve, control negative thoughts, and manage stress and anger during that entire time.
As late as March 8, 2000, Dr. Harris wrote that, having started driving a new route on his own, Artis was thinking “more about violence” and had concerns about his ability to control his anger. Dr. Harris further noted that Artis would need a rider to assist him on the route. On April 7, 2000, Dr. Harris indicated in his notes that Artis was having flashbacks of a “man running in front of [his] truck.” On April 27, 2000, Dr. Harris wrote that Artis was feeling “rage” and was going to terminate his medication. On May 4, 2000, Dr. Harris noted Artis was upset because employer had assigned him to drive the route where the fatal accident had occurred on October 2, 1999, and insisted that he do so even though Artis explained to employer that he was “having trouble sleeping,” was “having flashbacks,” and was off his prescription medication at that point. Dr. Harris further noted that Artis was feeling “pushed, trapped like [a] cornered animal [and] rage.” That same day, Dr. Harris sent a letter to employer, stating that Artis was “greatly stressed and somewhat regressed, secondary to being scheduled to service the route where his accident occurred on October 2, 1999.” Dr. Harris further stated in his letter that Artis was “clinically not ready to service that particular route at this time. He has made much progress in his therapy and his rehabilitation is progressing well. It is however important that we continue to work closely together towards supporting his full recovery.”
Dr. Harris’s records from June 7, 2000, indicate that Artis was experiencing symptoms, including homicidal feelings. On June 14, 2000, Dr. Harris noted that Artis was told by *106 employer that he could not get any more riders to assist him on his routes. Dr. Harris further noted that he would call or write employer regarding Artis’s “need for a rider from time to time” and that he recommended Artis continue with his medication.
On July 18, 2000, less than three weeks after Artis feigned the robbery, Dr. Harris opined that Artis’s involvement in the June 29, 2000 incident was “related to” Artis’s diagnosis of post-traumatic stress disorder. Dr. Harris further opined on September 24, 2002, that, as a result of the October 2, 1999 accident, Artis suffered from chrome post-traumatic stress disorder. Dr. Harris also opined on September 24, 2002, that “the feigned robbery of 06/29/00 resulted directly from Mr. Artis’s accident-related psychiatric condition. Mr. Artis was still actively traumatized by his 10/02/99 fatality, on 06/29/00. He was also frustrated, angry, fearful and problem-solving very poorly at that time. He was sleep deprived [with] suicidal ideation as well.” Again, Dr. Harris was positive in his diagnosis and opinion, and no other mental health professional’s opinion was offered to refute Dr. Harris’s assessment.
I find nothing in the record, particularly in Dr. Harris’s treatment notes and Artis’s testimony, that is inconsistent with Dr. Harris’s diagnosis and opinion. Despite rejecting Dr. Harris’s opinion, the commission identified no such specific inconsistency in the record. Clearly, Artis never testified that his feigning the robbery was unrelated to his October 2, 1999 accident. Nor does anything in Dr. Harris’s extensive treatment records suggest that the two incidents were not causally related. Indeed, Dr. Harris’s notations and Artis’s testimony regarding Artis’s “anger at his employer[] and frustration over his financial status” are not only consistent with but also clearly rooted in the documented post-traumatic stress disorder symptoms suffered by Artis during the treatment period, from his inability to contain his “paranoid, hostile, and violent urges” to his sleep deprivation and inability to problem solve, control negative thoughts, and manage stress and anger. As such, Dr. Harris’s notations and Artis’s testimony fully comport with Dr. Harris’s opinion that Artis’s involvement in the *107 June 29, 2000 incident was causally related to Ms accident-related psychological disorder. Dr. Harris’s uneqMvocal expert opiraon may not, therefore, be disregarded by the commission as “mherently incredible” or “inconsistent with other facts in the record.” Hercules, 13 Va.App. at 361, 412 S.E.2d at 187; see also McReynolds, 157 Va. at 471, 162 S.E. at 9. Accordingly, the commission could not properly rely solely on isolated portions of Dr. Harris’s notes and Artis’s testimony that were not inconsistent with Dr. Harris’s expert opinion to arbitrarily discount that opimon and to conclude on its own, in a matter that is clearly beyond common knowledge, that Artis’s feigning the robbery was not causally related to Ms industrial accident.[6] See Walrod, 210 Va. at 389, 171 S.E.2d at *108 185; Layton, 9 Va.App. at 487, 389 S.E.2d at 187. To do so on this record, despite the egregious nature of Artis’s misconduct, undermines the purpose of the Workers’ Compensation Act.[7]
Likewise, the commission’s reliance on this Court’s decision in Teasley, 14 Va.App. 45, 415 S.E.2d 596, to resolve the issue presented in this case is misplaced.
In Teasley, the employee, following an ongoing series of disagreements, had a confrontation with his supervisor over his work assignments. He broke down emotionally and was diagnosed with [post-traumatic stress disorder due to the workplace confrontation]. He sought benefits, contending that his [post-traumatic stress disorder] was an occupational *109 disease. The commission ... denied the employee’s claim because he failed to prove entitlement to compensation under Code § 65.1-46.1 (now Code § 65.2-401).
Mottram v. Fairfax County Fire & Rescue, 35 Va.App. 85, 94, 542 S.E.2d 811, 814-15 (2001) (emphasis added) (citing Teasley, 14 Va.App. at 49-50, 415 S.E.2d at 598-99), aff'd in part and rev’d in part, 263 Va. 365, 375, 559 S.E.2d 698, 703 (2002). Holding that “purely psychological disability” resulting from “disagreements over managerial decisions and conflicts with supervisory personnel that cause stressful consequences ... ordinarily are not compensable,” we affirmed that decision. Teasley, 14 Va.App. at 49, 415 S.E.2d at 598.
Here, unlike in Teasley, it is undisputed that Artis’s post-traumatic stress disorder arose from his October 2,1999 work-related accident when he unavoidably killed a pedestrian, and not because of any disagreements or conflicts with employer. The relevant question here, therefore, is not whether Artis had angry disagreements with his employer, but whether he was unable to appropriately manage his anger towards employer and desist from acting on that anger because of the continuing psychological trauma of his work-related accident. The only evidence in the record that answers that question was provided by Dr. Harris, who clearly attributed the feigning of the robbery to the post-traumatic stress disorder Artis suffered. Dr. Harris unequivocally stated that the misconduct “resulted directly from Mr. Artis’s accident-related psychiatric condition.” Dr. Harris further stated that Artis was “still actively traumatized” at the time of the feigned robbery by his work-related accident. As a result, Dr. Harris stated, Artis was “frustrated, angry, fearful,” and sleep deprived at the time of the feigned robbery, as well as exhibiting poor problem-solving ability and suicidal ideation. Dr. Harris further stated that, “[i]n Artis’s mind[,] [the feigned robbery] was not an act of robbery, but one of symbolically regaining his loss of control.” Hence, Teasley is inapplicable here.
Furthermore, the commission’s vague reliance on the fact that Artis had a prior problem with rage as a dispositive factor in this case is also misplaced. While Artis indicated in his *110 intake questionnaire with Dr. Harris that he had received prior psychological treatment for “rage” in 1996, no evidence was presented showing the precise nature or severity of that problem or the treatment therefor. Moreover, no evidence was presented to show that such a condition persisted three years later in 1999. Indeed, nothing in the record supports the commission’s conclusion that the rage that resulted in the feigned robbery was simply a recurrence or continuation of Artis’s earlier condition or that it was wholly unrelated to Artis’s post-traumatic stress disorder. To the contrary, Artis testified that he had not previously suffered any symptoms similar to those he suffered as a result of his work-related accident. Artis’s testimony was uncontradicted. In addition, Dr. Harris testified that Artis’s post-traumatic stress disorder prevented him from properly managing his anger. Significantly, Dr. Harris was clearly aware of that notation by Artis in the questionnaire when he opined that Artis’s conduct on June 29, 2000, was directly related to the October 2, 1999 accident. Dr. Harris drew no causal connection, in his treatment notes or elsewhere, between the prior condition noted by Artis and Artis’s psychiatric disorder resulting from the accident. Nor, as previously noted, did any other health care professional do so in the record.
In addition, even assuming Artis’s prior treatment for rage was relevant, “[i]t is well established that the employer takes the employee as the employer finds the employee, even where the employee suffers some [pre-existing] infirmity.” Williams Indus., Inc. v. Wagoner, 24 Va.App. 181, 187-88, 480 S.E.2d 788, 791 (1997); see also Owens, 30 Va.App. at 88, 515 S.E.2d at 350 (“The fact that [claimant] previously suffered from PTSD, and that this incident only aggravated a pre-existing condition, is not fatal to his claim.”). “A finding that a preexisting condition ‘was accelerated or aggravated’ by an injury sustained in an industrial accident establishes a causal connection between the injury and disability[,] and the ‘disability resulting therefrom is compensable under the Workers’ Compensation Act.’” Southern Iron Works, Inc. v. Wallace, 16 Va.App. 131, 134, 428 S.E.2d 32, 34 (1993) (quoting Olsten of *111 Richmond v. Leftwich, 230 Va. 317, 320, 336 S.E.2d 893, 895 (1985)). Plainly, if Artis had a pre-existing psychological condition, the evidence in this case shows that Artis’s traumatic October 2, 1999 accident was sufficiently sudden, shocking, and frightful to have accelerated or aggravated that condition. See Owens, 30 Va.App. at 88, 515 S.E.2d at 350 (holding that, to be compensable, the aggravation of a pre-existing psychological condition must be “causally related to (1) a physical injury or (2) to an obvious sudden shock or fright in the employment”). Therefore, the mere, undeveloped fact that Artis received treatment for a prior psychological condition in 1996 is not persuasive evidence to show that Artis’s discharge from selective employment was not properly attributable to the psychiatric disability he suffered as a direct result of his October 2,1999 compensable accident.
Thus, based on the record in this case, I would hold, as a matter of law, that no credible evidence supports the commission’s finding of fact that Artis’s post-termination wage loss was causally related solely to his misconduct on June 29, 2000, and not to his October 2,1999 compensable injury by accident. I would further hold that, in proving by a preponderance of the evidence that his feigning the robbery and resultant discharge from selective employment and wage loss were causally related to his October 2, 1999 compensable industrial accident, Artis met his burden of proving his entitlement to compensation for his post-termination wage loss. Dr. Harris’s unequivocal expert opinion was that Artis suffered from post-traumatic stress disorder resulting from his October 2, 1999 compensable accident and that Artis’s actions on June 29, 2000, resulted directly from that psychological disorder. No evidence contradicts Dr. Harris’s opinion, and I find no internal conflict in it. In fact, Dr. Harris’s treatment notes and letters demonstrate the existence of an unbroken causal connection between Artis’s work-related accident and his feigning the robbery. Thus, the uncontradicted evidence presented in this case establishes, as a matter of law, that Artis’s termination from selective employment was causally related and, thus, properly attributable to his compensable work-related *112 accident and the resultant disability. Thus, consistent with the purpose of the Workers’ Compensation Act, employer is responsible for Artis’s resulting post-termination wage loss. See Reese, 24 Va.App. at 338, 482 S.E.2d at 97.
III.
In summary, I would hold that an injured employee’s firing for cause does not, in itself, automatically foreclose post-termination wage-loss compensation. If it is shown that the reason for the termination (e.g., the employee’s misconduct) was properly attributable to the employee’s work-related injury, the employee is entitled to benefits. I would further hold that, under the facts presented in this case, the commission erred in finding Artis had not met his burden of showing that his post-termination wage loss was properly attributable to his industrial accident. In focusing in its analysis primarily on the nature of Artis’s misconduct, rather than on the underlying causal effect of Artis’s work-related injury on his conduct, and permitting the commission to arbitrarily discount Dr. Harris’s uncontroverted opinion regarding the causal connection between Artis’s misconduct and the psychological disorder he suffered as a result of his industrial accident, the majority appears to disregard the essential purpose of the Workers’ Compensation Act, which is to compensate disabled workers for wage losses properly attributable to industrial accidents.
For these reasons, I would reverse the commission’s decision denying Artis’s claim for post-termination temporary partial disability benefits, enter judgment in favor of Artis, and remand this case to the commission for the purpose of calculating the appropriate benefits.

. In asking in its "overriding inquiry” solely whether "the claimant [was] fired because of his disability[ ] or ... because of his misconduct,” and requiring the claimant "to demonstrate that his termination was attributable to his disability rather than his wrongful act,” the majority wholly fails to consider whether the wrongful act or misconduct for which the claimant was fired was properly attributable to his work-related injury.

. Relying on John v. Im, 263 Va. 315, 559 S.E.2d 694 (2002), the majority states that the commission was not required to accept the uncontradicted opinion of Dr. Harris that Artis’s misconduct was directly related to his work-related injury because Dr. Harris is only a psychologist and "not a medical doctor.” In my view, John, an automobile accident liability case involving the admissibility of an expert’s opinion offered to prove that the plaintiff sustained a physical injury, has no bearing on this case. In John, the Supreme Court held that the expert witness, who was a licensed psychologist rather than a medical doctor, was "not qualified to state an expert medical opinion regarding the cause of [a physical human] injury” because such an opinion "is part of the practice of medicine.” Id. at 321, 559 S.E.2d at 697. In other words, an expert witness may not render an opinion regarding a subject outside his or her field of expertise. Here, unlike in John, not only was the admissibility of Dr. Harris’s opimon never contested, Dr. Harris’s opinion was not about a "physical injury.” Rather, he opined solely that Artis’s feigning the robbery was a direct result of his post-traumatic stress disorder, which itself was a direct result of his work-related accident. It is well settled in Virginia that clinical psychologists with the proper training, expertise, and experience are generally qualified to give expert testimony regarding a person’s mental condition and to state an expert medical opinion regarding the relationship between that person’s mental condition and his or her conduct. See, e.g., Ward v. Commonwealth, 264 Va. 648, 653, 570 S.E.2d 827, 831 (2002) (holding that a clinical psychologist was properly permitted to give expert testimony "about the victim’s mental condition”); Rollins v. Commonwealth, 207 Va. 575, 581, 151 S.E.2d 622, 626 (1966) (stating that "the use of the psychologist in present society is growing and with this will come an increasing tendency to call him as an expert witness on the question of mental condition” (internal quotation marks omitted)); Code § 19.2-169.5 (providing that a qualified clinical psychologist may be appointed by the trial court "to evaluate [a] *108 defendant’s sanity at the time of the offense and, where appropriate, to assist in the development of an insanity defense”); cf. Code § 54.1-3600 (defining the “[pjractice of clinical psychology” as, inter alia, the "[¿diagnosis ... of mental and emotional disorders ”). Hence, the rule stated in John does not apply here to allow the commission to disregard Dr. Harris's expert medical opinion simply because he is a psychologist rather than a psychiatrist.

. As Artis points out on appeal, however, certain types of misconduct would prevent a claimant like him from receiving post-termination workers' compensation benefits. For example, Code § 65.2-510.1(A) provides as follows:
Whenever an employee is imprisoned in a jail, state correctional facility, or any other place of incarceration and (i) the imprisonment resulted from the employee’s conviction of a criminal offense and followed his sentencing therefor by a court of competent jurisdiction, (ii) the employee is receiving compensation for temporary total incapacity pursuant to § 65.2-500 or temporary partial incapacity under § 65.2-502, and (iii) the employee is medically released to perform selective employment, compensation benefits for wage loss shall be suspended under § 65.2-708 upon filing of a proper application to the [cjommission.
Furthermore, before a partially disabled claimant may receive wage-loss compensation, the claimant must first prove that he or she has adequately marketed his or her residual work capacity. See Washington Metro. Area Transit Auth. v. Harrison, 228 Va. 598, 600-01, 324 S.E.2d 654, 655-56 (1985); Watts v. P & J Hauling, Inc., 41 Va.App. 278, 286, 584 S.E.2d 457, 461 (2003). An incarcerated claimant would be unable to establish this required element because the claimant’s incarceration would constitute a removal from the labor market. See, e.g., Baskerville v. Saunders Oil Co., 1 Va.App. 188, 193, 336 S.E.2d 512, 514-15 (1985).